IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LUKE JOHN SCOTT, SR.,<br><br>Defendant. | Cause No. CR 19-29-GF-BMM<br>CR 19-30-GF-BMM<br><br>ORDER REGARDING DEFENDANT'S MOTIONS<br>(CR-19-30-GF-BMM, DOCS. 127 & 129) |

### INTRODUCTION

Defendant Luke John Scott, Sr. (Scott) filed in CR-19-30-GF-BMM what he fashioned as an *ex parte* motion to suppress and request for hearing (CR-19-30-GF-BMM, Doc. 127), and a "Motion in Limine to Suppress all of Defendant's Statements and Request for a Hearing" (CR-19-30-GF-BMM, Doc. 129). Scott filed three supporting documents as follows: (1) a "Brief in Support of Defendant's

1

Motion to Suppress," (CR-19-30-GF-BMM, Doc. 130); (2) an "Affidavit in Support of Suppression Motion," (CR-19-30-GF-BMM, Doc. 131); and (3) "Defendant Luke John Scott's Exhibit List for His Suppression Motion," (CR-19-30-GF-BMM, Doc. 132). Scott also filed what he labeled as "Defendant's Exhibit List for *Franks* Hearing" in both CR-19-29-GF-BMM and CR-19-30-GF-BMM. (CR-19-29-GF-BMM, Doc. 137 & CR-19-30-GF-BMM, Doc. 128.)

The Court reviewed Scott's filings and noted that Scott's "Exhibit List for *Franks* Hearing" appeared to relate to Scott's motion to suppress, Doc. 127, in CR-19-30-GF-BMM. (CR-19-29-GF-BMM, Doc. 140 at 2 & CR-19-30-GF-BMM, Doc. 138 at 2.) The Court further noted that it was aware of no basis to permit a party to file an *ex parte* motion to suppress. (CR-19-30-GF-BMM, Doc. 138 at 2.) The Court directed the Clerk of Court to unseal Scott's *ex parte* motion to suppress and file it in the regular course. (*Id.*)

The Court directed the Government to respond to Scott's motions. (CR-19-29-GF-BMM, Doc. 140 at 3 & CR-19-30-GF-BMM, Doc. 138 at 3.) The Court instructed the Government to construe Scott's "Motion in Limine to Suppress all of Defendant's Statements and Request for a Hearing" (CR-19-30-GF-BMM, Doc. 129), as a motion to suppress. (CR-19-29-GF-BMM, Doc. 140 at 3-4 & CR-19-30-GF-BMM, Doc. 138 at 3-4.) The Court also asked the Government to address

specifically in its response whether a search pursuant to a warrant occurred and whether a *Franks*-type attack is appropriate. (*Id.*) The Government responded in opposition to Scott's motions. (CR-19-30-GF-BMM, Doc. 156.)

## DISCUSSION

Having reviewed thoroughly Scott's motion and the Government's response, the Court now clarifies that it will treat what Scott fashioned as an *ex parte* motion to suppress and request for hearing (CR-19-30-GF-BMM, Doc. 127) as a Motion for a *Franks* Hearing in CR-19-30-GF-BMM. The supporting exhibit list that Scott filed in both CR-19-29-GF-BMM (Doc. 137) and CR-19-30-GF-BMM (Doc. 128) does not appear to be applicable to CR-19-29-GF-BMM. The Court will file this Order in CR-19-29-GF-BMM to ensure that the record remains complete, but the remainder of this Order is applicable only to CR-19-30-GF-BMM.

The Court has already determined that it would construe Scott's "Motion in Limine to Suppress all of Defendant's Statements and Request for a Hearing" (CR-19-30-GF-BMM, Doc. 129), as a motion to suppress. (CR-19-30-GF-BMM, Doc. 138 at 3-4.) The Court will consider the supporting documents that Scott filed, Docs. 130, 131, and 132, in its evaluation of Scott's motion. The Court will address Scott's Motion to Suppress (Doc. 129), and Scott's Motion for a *Franks*

3

Hearing (Doc. 127) in turn.

I.     SCOTT'S MOTION TO SUPPRESS

The Court first will address Scott's Motion to Suppress. (CR-19-30-GF-BMM, Doc. 129.) Fort Peck Tribal Police arrested Scott on the night of the alleged assault. (Doc. 156 at 4-7.) Scott made statements to the arresting officer and then provided a handwritten statement. (Doc. 132-1 at 3-4.) Three days later, on July 10, 2017, Scott made a recorded statement with FBI Special Agent Craig Overby ("SA Overby"). (Doc. 156-3.) The Fort Peck Tribal Police Criminal Investigator also was present for Scott's recorded interview. SA Overby advised Scott of his *Miranda* rights before conducting the recorded interview. Scott signed a written waiver of his right to remain silent. (Doc. 156-1.)

Scott challenges the voluntariness of his statements on two grounds. First, Scott argues that his level of intoxication on the night of his arrest renders his statements that night involuntary. (Doc. 129 at 4.) Second, Scott argues that the FBI used coercive tactics to elicit Scott's statement on July 10, 2017, by promising that they would provide a Scott a polygraph test and promising that they would arrest the complaining witness if he spoke with them. (*Id.* at 4-5.)

Scott's argument that his level of intoxication on the night of his arrest renders his statements involuntary proves directly contradicted by Scott's own

4

statements that he made during the subsequent recorded interview. (Doc. 156-4 at 46:00.) Scott described his intoxication level on the night of his arrest as a four out of ten when the sexual encounter with the alleged victim occurred:

> AGENT OVERBY: Okay. And so you were about a four when you guys -- so, there -- nobody could say you were so out of it that you didn't know what you were doing when you—
>
> DEFENDANT: No
>
> AGENT OVERBY: -- guys had sex
>
> DEFENDANT: I wouldn't say that, no.

(Doc. 156-4 at 46:20-47:00.) Scott further explained that his intoxication was at the same level when he was arrested, as he had consumed no more alcohol after his arrest. (*Id.*) Scott, by his own subsequent admission, was not so intoxicated when he was arrested to render his statements involuntary.

Scott next argues that law enforcement officers coerced him into talking with SA Overby on July 10, 2017. (Doc. 129 at 4-5.) Scott claims that a Fort Peck Tribal Police Officer coerced him into making a statement to the FBI by promising him that they would provide a polygraph test and, if he passed, throw the complaining witness in jail. (Doc. 129 at 4-5; Doc. 131 at 2.) Scott claims further that a Fort Peck Tribal Police Criminal Investigator also promised him a polygraph and adverse action against the complaining victim if he agreed to speak with SA

5

Overby. (Doc. 131 at 2.)

SA Overby conducted a custodial interview with Scott on July 10, 2017. SA Overby recorded the interview. Scott received his *Miranda* rights at the outset of the interview and waived his right to remain silent. (Doc. 156-1.) The Court assesses the voluntariness of a defendant's statement based upon the totality of the circumstances, including whether police obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998). A defendant's state of mind, on its own, fails to render a statement involuntary. *Colorado v. Connelly*, 479 U.S. 157, 165–66 (1986). Some form of "coercive police activity" represents "a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167.

The Court must focus on whether the police obtained a confession in a manner "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). The following non-exclusive list of factors relate to voluntariness: (1) the defendant's youth; (2) the defendant's intelligence; (3) lack of advice of constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep. *United States v.*

*Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

Here, there is no evidence that law enforcement used deception, coercive means, or improper inducement to obtain Scott's statements. To the contrary, the interview proceeded in a typical, professional manner. Scott participated eagerly in the interview. Scott began talking even before the agent could push the record button and introduce the matter. Scott directed most of the conversation, with very little questioning or input from the SA Overby. Most of SA Overby's questions were clarification questions.

The Court's examination of each of the *Haswood* factors supports its conclusion that Scott's statements were voluntary. Scott was not young; at the time of the interview he was twenty-nine years old. In the interview he disclosed his two prior federal offenses, telling the agents, "I know the Feds pretty well." (Doc. 156-4 at 31:30-32:05). There is no indication that Scott suffers less than average intelligence or understanding of someone his age. (*See* Doc. 130 (Scott's ten-page handwritten *pro se* brief in support of his motion)). SA Overby advised Scott of his rights under *Miranda* and Scott waived those rights. (Doc. 156-1; Doc. 156-4 at 1:30-2:30). Scott conversed with SA Overby freely and without reservation. He understood the questions and gave a free narrative. The interview lasted about an hour and fifteen minutes; it was not overly long. SA Overby did not use enhanced

interrogation techniques such as deprivation of food or sleep.

Here, the advisement of rights that SA Overby gave to Scott complied with *Miranda* and contributes to the voluntariness of Scott's subsequent statements. SA Overby obtained a clear, voluntary, knowing, and intelligent waiver. (Doc. 156-1; Doc. 156-4 at 1:30-2:30). Scott alleges that he was coerced to speak by the promise that he would be given a polygraph, but Scott's allegations remain the only evidence that such a conversation took place. Rather, the record demonstrates that it is Scott himself who first raised the possibility of a polygraph with no promise or agreement by the agents:

> DEFENDANT: All right. Well, before I start, before I say anything, I just want -- I want you guys to know that, you know, I'm fully willing to take a polygraph test.
>
> AGENT OVERBY: Okay.
>
> DEFENDANT: I mean, if that's -- you know, if you guys still do that.
>
> AGENT OVERBY: Oh, okay.

(Doc. 156-4 at 2:45-2:56.)

The record demonstrates that Scott offered a polygraph; the record does not demonstrate that the officers offered him one or promised one in exchange for a statement. Furthermore, Scott does not cite to—and the Court remains unaware of—any case in which a court held that law enforcement's promise to provide a

8

polygraph, and the subsequent lack of administration of one, proved to be a coercive interrogation tactic.

SA Overby recorded the entire interaction and the Court reviewed the recording. There is simply no evidence that SA Overby utilized coercive law enforcement conduct to overcome Scott's will. Scott's efforts to suppress the statements that he made to SA Overby based on Scott's allegations that the FBI used coercive tactics by promising him that they would provide a polygraph test and promising adverse action against the complaining witness fail.

The Court recognizes that Scott retains the right to a hearing under 18 U.S.C. § 3501 to determine the voluntariness of his statements before they are admitted into evidence at trial. *See Jackson v. Denno*, 378 U.S. 368, 376-77 (1964) (emphasizing a defendant's constitutional right to a hearing on the issue of voluntariness). The Government represented that it would anticipate calling three law-enforcement witnesses at the hearing, two who work for the Tribes in Poplar and one who works out of Glasgow. (Doc. 156 at 10-11.) The Court will deny without prejudice Scott's Motion to Suppress for the time being. If he desires, Scott may renew his motion at the time of his trial, currently set for August 25, 2020. The Court will, if necessary, hold a hearing outside of the jury's presence at that time.

## II.     *FRANKS* HEARING

As to Scott's Motion for a *Franks* Hearing, Scott asserts that tribal law enforcement officers and FBI agents lied to the grand jury in order to obtain an Indictment against Scott. (Doc. 127 at 3-4.) Scott asserts that officers lacked probable cause to arrest Scott because they arrested him on a warrant issued pursuant to the Indictment, which was based on that false testimony before the grand jury. (*Id.* at 4.) Scott contends that the officers and/or Government plan to use the indictment as a "bargaining chip" to secure a guilty plea from Scott. (*Id.*)

The Supreme Court addressed a challenge to the affidavit attached to a search warrant application in *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). To succeed on a *Franks* claim, a defendant must show (1) that a law enforcement official deliberately or recklessly included a false statement or omitted a true statement from the warrant affidavit, and (2) establish that the warrant affidavit would not establish probable cause if the false or omitted information was omitted from the analysis. *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017). A defendant may receive a *Franks* hearing, however, only if they make "a substantial preliminary showing" on both prongs of the *Franks* analysis. The party must then satisfy both prongs by a preponderance of evidence at the *Franks* hearing. *United States v.Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).

The Government never sought or obtained a search warrant in either of Scott's cases. (*See* CR-19-29-GF-BMM, Doc. 4 (arrest warrant); CR-19-30-GF-BMM, Doc. 4 (arrest warrant).) The Government never found any evidence that it intends to introduce at either of Scott's trials as part of a search of Scott's house or belongings pursuant to any search warrant. Further, the Court remains aware of no decision of any court to apply the principles set forth in *Franks* to any type of warrant other than search warrant. Scott has identified none. Even if Scott could mount a *Franks*-type attack in his cases, he has failed to make "a substantial preliminary showing" on both prongs of the *Franks* analysis.

*Franks* allows a defendant to challenge the admissibility of evidence seized by a search warrant based on an affidavit that knowingly and intentionally, or with reckless disregard for the truth, included false statements. *Franks*, 438 U.S. at 155-56. Once a defendant makes a substantial preliminary showing that the affiant deliberately or recklessly included a false statement or omitted a material true statement from the warrant affidavit, and but for those statements, the affidavit would not establish probable cause, he is entitled to a *Franks* hearing to challenge the affidavit. *Perkins*, 850 F.3d at 1116.

The Government points out that no officers swore out affidavits in support of an arrest warrant in either case. The officers arrested Scott by warrant after a

11

grand jury returned the indictments. (CR-19-29-GF-BMM, Doc. 5; CR-19-30-GF-BMM, Doc. 5.) No law supports the notion that Scott can challenge the veracity of statements made during grand jury testimony through a *Franks* evidentiary hearing. The United States Supreme Court routinely has determined that the process of grand jury deliberation and decision-making generally falls outside the courts' scope of supervisory authority. *United States v. Williams*, 504 U.S. 36 (1992).

The Court already has denied Scott's request for a transcript of the grand jury proceedings based upon his failure to demonstrate a "particularized need" for the transcripts. (CR-19-29-GF-BMM, Doc. 124 at 4-5; CR-19-30-GF-BMM, Doc. 120 at 4-5.) As the Court explained, Scott can challenge the statements to the grand jury if one of the witnesses testifies at his criminal trial. (*Id.*) The Jencks Act requires the Government to provide Scott with a witness's testimony to the grand jury after the witness has testified at trial. (*Id.* at 3 (citing *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1031 n.1 (9th Cir. 2009))). The Jencks Act limits the Court's authority to require the production of these statements until after the witness has testified. 18 U.S.C. § 3500(a).

Accordingly, **IT IS HEREBY ORDERED** that Scott's Motion to Suppress

and Request for Hearing (CR-19-30-GF-BMM, Doc. 129) is **DENIED WITHOUT PREJUDICE**. **IT IS ALSO ORDERED** that Scott's Motion for a *Franks* Hearing (CR-19-30-GF-BMM, Doc. 127) is **DENIED**.

DATED this 27th day of May, 2020.

_____
Brian Morris, Chief District Judge
United States District Court