# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LUKE JOHN SCOTT, SR.,<br><br>Defendant. | CR-19-30-GF-BMM<br><br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br>(DOC. 299) |

Defendant Luke John Scott, Sr. ("Scott") is representing himself in the above-captioned criminal case, with Bryan Norcross acting as stand-by counsel. (Doc. 72). Scott filed a Motion Suppress under the exclusionary rule to suppress statements, an interview, and a letter that he wrote. (Doc. 299). The Court held a hearing on the motion on January 14, 2021. (Doc. 348).

The Government presented testimony from Fort Peck Tribal Police Officer Coretta Greybear and Fort Peck Criminal Investigator Sean Redboy. Scott claimed he sought to present testimony Dr. Brian G. Drage. *Id.* The Court previously had advised Scott at a scheduling hearing to file subpoenas for any witnesses he wished to testify at the suppression hearing. (Doc. 332). Scott filed a subpoena for Dr. Drage to appear to testify at trial. (Doc. 333). The Court granted that subpoena.

(Doc. 337). The Court received no request for a subpoena to testify at the suppression hearing from Scott. A search of the record further indicates the Court did not receive such a filing. In lieu of testimony from Dr. Drage, the Court allowed Scott to make an offer of proof as to the expected testimony of Dr. Drage. Scott represented that Dr. Drage's testimony would explain the findings of medical reports relating to examination of Jane Doe.

Officer Greybear testified that she arrested Scott in the early morning hours of July 8, 2017. Officer Greybear acted on an accusation by Jane Doe, the complaining witness. At the time of Scott's arrest, the complaining witness had called 911 and reported the assault, had gone to the hospital where she reported the assault and rape, and law enforcement observed injuries, scratches, and clothing conditions that corroborated these allegations. Officer Greybear then acted on those statements and that information. Officer Greybear described that she arrested Scott based on the above information at the time of the arrest in her case report sealed in the record. Officer Greybear also testified at the January 14 hearing that she acted on that information.

Scott seeks to suppress statements, an interview, and a letter that he wrote. (Doc. 299 at 2). Each of these statements occurred within the first three days after his arrest on July 8, 2017. Scott made statements to the arresting officer and provided a handwritten statement. (Doc. 132-1 at 3–4). On July 10, 2017, Scott

2

made a recorded statement with Special Agent Craig Overby with the Federal

Bureau of Investigation and a tribal Criminal Investigator. (Doc. 132-4). Scott

argues that his initial tribal arrest violated the Fourth Amendment and that Scott's

subsequent statements constitute "fruit" of an illegal search. (Docs. 299, 300).

The exclusionary rule prevents the government from introducing most

evidence gathered in violation of the Fourth Amendment of the United States

Constitution. The exclusionary rule applies in federal court to violations of the

Indian Civil Rights Act's Fourth Amendment counterpart. *United States v. Cooley*,

919 F.3d 1135, 1143 (9th Cir. 2019), *cert. granted*, No. 19-1414, 2020 WL

6811249 (U.S. Nov. 20, 2020); 25 U.S.C. § 1302 (listing the constitutional rights

provides under the Indian Civil Rights Act).

Scott centers his motion on the U.S. Supreme Court decision *Brown v.*

*Illinois*, 422 U.S. 590 (1970). *Brown* differs significantly from the circumstances

here. Two detectives, armed with a photograph of Brown, and another officer,

arrived at Brown's apartment in the late afternoon. *Brown*, 422 U.S. at 593. The

third officer covered the front entrance downstairs while the two detectives

illegally broke into Brown's apartment and searched it without a warrant. *See id.*

The third officer later arrested Brown as he attempted to enter his apartment from

the back stairs. *See id.* Two of the officers held Brown at gunpoint as the three

officers forced Brown into the apartment. *See id.* The officers ordered Brown to

stand against the wall and searched him. *See id.* They found no weapon. *See id.* The officers arrested Brown, handcuffed him, and escorted him to the squad car for the drive to the police station. *See id.*

The officers warned Brown of his rights under *Miranda* in the interrogation room at the police station. *See id.* at 594. The officers informed Brown that they knew of an incident that had occurred in a poolroom some weeks earlier. *See id.* Brown acknowledged the poolroom incident. *See id.* The officers then asked Brown whether he wanted to talk about the alleged homicide that they were investigating. *See id.* Brown agreed to talk and answered questions for about 20 minutes. *See id.*

This questioning produced a two-page statement in which Brown admitted that he and another man had visited the victim on the evening in question and in which he made numerous incriminating statements. *Id.* at 594–95. Brown signed the statement. *See id.* at 595. Two of the officers testified at a suppression hearing that they had arrested Brown "for investigation" and "questioning." *Id.* at 605. All parties agreed that the Brown's arrest lacked probable cause and had been effectuated without a warrant. *See id*.

Illinois courts previously had adopted a per se rule that *Miranda* warnings cleared any later admission from exclusion based on a wrongful arrest. *See id.* at 605. The U.S. Supreme Court struck down that per se rule and limited its ruling to

4

the use of such a per se rule to cure an unlawful arrest. The Supreme Court made sure to "emphasize that our holding is a limited one. We decide *only* that Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." *Id.* at 605 (emphasis added).

The circumstances of *Brown* differ from this case in three significant ways: 1) law enforcement did not enter Scott's house illegally; 2) law enforcement arrested Scott with probable cause rather than merely to conduct an investigation; and 3) the Court has not adopted nor has it applied a per se rule that would validate admissions made following an unlawful arrest so long as *Miranda* warnings are given.

Probable cause is not a high standard. The Fort Peck Tribes define probable cause as "such facts and circumstances which would lead a reasonable person to believe that an offense has been committed." 6 Fort Peck Tribes Comprehensive Code of Justice Sec. 201(d). The long-defined Fourth Amendment probable cause standard requires more than an officer's mere suspicion. *See, e.g.*, *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The probable

5

cause standard falls well below the standard at trial of proof beyond a reasonable doubt. Yet even in trial, the testimony of only one witness may prove sufficient to uphold a conviction. *United States v. Larios*, 640 F.2d 938 (9th Cir. 1981).

The alleged victim here provided multiple statements to law enforcement regarding her assault in which she identified Scott as the assailant. One of the officers corroborated these allegations through her own observations of the victim's medical exam and the victim's condition. The arresting officer noted these statements and observations in her contemporaneous report as well as in her testimony at the hearing. The arresting officer arrested Scott based on that information—information that clearly constitutes probable cause. Probable cause supported Scott's initial tribal arrest, and so his statements to officers, after having received *Miranda* warnings, could not be the fruit of a poisonous tree.

The Court has not adopted, and will not adopt, a per se rule that *Miranda* warnings would inoculate statements from potential exclusion as fruit of the poisonous tree. The U.S. Supreme Court noted in is "limited ruling" in *Brown* that Illinois courts could not adopt a per se rule that *Miranda* warnings would break the causal connection between an illegal arrest and a confession. *Brown*, 422 U.S. at 603–05. This portion of the precedent from *Brown* does not apply here because the Court has not adopted such a per se rule.

## ORDER

**IT IS ORDERED** that Scott's Motion to Suppress (Doc. 299) is **DENIED**.

Dated the 19th day of January, 2021.


_____
Brian Morris, Chief District Judge
United States District Court